**In the Matter of PENN CENTRAL TRANSPORTATION CO., Debtor.**

**Petition of John A. DILLIARD.**

**No. 70–347.**

United States District Court, E. D. Pennsylvania.

March 20, 1975.

Ivan Shomer, Philadelphia, Pa., for trustees, PCTC.

Richard M. Goldwater, Goldwater & Flynn, New York City, for John A. Dilliard.

Robert J. Minyard, Kelly, Drye, Warren, Clark, Carr & Ellis, New York City, for Mfg. Hanover Trust Co.

## MEMORANDUM AND ORDER NO. 1819

FULLAM, District Judge.

In 1972, the City of New York petitioned this Court for leave to proceed under state law to condemn certain real estate owned by the Debtor. In response to that application, the present petitioner, John Dilliard, claimed to be the equitable owner of the property in question, having allegedly exercised an option to purchase the property. On May 30, 1972, without objection, I entered Order No. 737, granting the City of New York the right to proceed with condemnation, but reserving to this Court the right to determine adverse claims of ownership.

Thereafter, certain payments on account were made in the condemnation proceeding, and are being held in escrow. The case is now before the Court on the petition of Mr. Dilliard (Document No. 5769) seeking payment to him of some or all of the escrowed proceeds, and seeking an adjudication as to his rights in the property.

For purposes of exposition, Mr. Dilliard and his various predecessors in interest will be referred to herein as the "petitioner." Penn Central Transportation Company and its predecessors will be referred to as "the railroad" or "the Debtor."

On April 18, 1960, the railroad leased the property in question to the petitioner. The lease contained a "tenant's option to purchase" provision which, in relevant part reads as follows:

> ". . . The Landlord does hereby grant unto the tenant the right and option to purchase the Demised Prem-

ises at any time during the term hereof commencing with the beginnning of the term hereof until September 30, 1964 . . . at the price and upon the conditions hereafter set forth. The purchase price for the demised premises shall be the sum of $420,000 in lawful money of the United States, payable as follows:

"$42,000 simultaneously with the exercise of this option by the tenant as herein provided, and $378,000 on the date of delivery of the deed . . .

"This option shall be exercised by the tenant only by written notice to that effect by the tenant (buyer) to the seller at 466 Lexington Avenue, New York 17, New York, at any time during the time limit hereinabove specified, and in the event of such exercise the sale and conveyance of the demised premises shall be consummated pursuant to the terms and provisions of this lease."

Thereafter, by letter modifications, the lease was extended from time to time and modified in various ways. The net effect of these modificaions was to extend the period of time during which the option to purchase might be exercised until July 31, 1970.

By way of further background, it should be mentioned that the property in question is located diagonally across the street from another parcel which had previously been leased to the petitioner, with an option to purchase at a price pegged to the cost of certain improvements to be erected by the petitioner. The contemplated improvements were completed, petitioner exercised his option, and the railroad conveyed that parcel to the petitioner in 1964.

The lease of the parcel now in dispute also contemplated the construction of improvements by the petitioner, but for reasons not disclosed on the record, the improvements were never made. The principal effects of the various modifications of the original lease of this parcel seem to have been the reduction of the rental payable by the petitioner, and the extension of the term, of the lease from time to time; it appears that, under the final version, petitioner was paying rent equal to the taxes assessed against the parcel.

On June 21, 1970, the railroad entered bankruptcy. The purchase option was due to expire on July 31, 1970. The option price was $420,000, but the actual market value was then considerably in excess of that sum. On the other hand, the City of New York was known to be contemplating the condemnation of both parcels, although it is not entirely clear just how far these condemnation plans had advanced.

Under the terms of the option provisions of the lease, the petitioner would have been required to take title subject to existing judgments, and subject to liens for certain New York corporation taxes, on the strength of the railroad's agreement to indemnify against liability for payment of such judgments and tax liens.

Upon exercise of the option, the railroad was required to convey title free and clear of mortgage liens. Before bankruptcy, the parties apparently anticipated no difficulty in obtaining the necessary releases from the mortgagees. It is apparent that the petitioner was apprehensive that such releases would not be obtainable after bankruptcy.[1]

---

1. Certain aspects of the legal problems potentially involved are discussed in In re Penn Central Transportation Co. (Petition of New York State Urban Development Corp.), 468 F.2d 1222 (3d Cir. 1972), vacating 346 F.Supp. 1323 (E.D.Pa.1972), but the principal issue there had to do with the power to require the mortgagees to accept pre-bankruptcy additions and betterments in lieu of cash, and the nature of factual findings which might justify such a result. While it has been contended by some indenture trustees, depending upon the precise wording of the mortgage indenture, that the railroad's right to obtain releases is terminated by default (i. e., by entering reorganization), as a practical matter it is generally to the advantage of the mortgagee to permit sales to go forward, with the proceeds being held in escrow subject to liens. And, of

Under date of July 29, 1970, petitioner sent to the railroad a letter which, it is now contended, constituted an exercise of the option contained in the lease. Because of the critical importance of this document, the pertinent provisions are set forth herein at length:

"Gentlemen:

Pursuant to a certain lease dated April 18, 1960 [specifying the parties and subsequent amendments] we, as the successor by merger with the foresaid tenant, have the option to purchase the demised premises for $420,000 providing we exercise our option on or before July 31, 1970.

"Under the terms of the said lease, as amended, we are required to deliver to you a certified check for $42,000 at the time we exercise the option, and the balance of the purchase price of $378,000 upon your delivering to us a deed . . . The said deed is to be delivered within 120 days of your receipt of the notice to exercise the option.

"Because of the pending Proceedings for the Reorganization of the Railroad in the Matter of the Penn Central Transportation Company, we are hesitant to deliver to you our certified check covering the exercise of the option without first receiving proper assurances, including court authorization, if our counsel deems it necessary, that the said $42,000 will be refunded to us in the event that you are unable to deliver marketable title free and clear of all existing liens and mortgages presently affecting the property, which we understand total at present approximately $750,000,000.

"We would appreciate your advising us as to the present status as to your ability of securing the essential releases of the mortgages presently affecting the property.

"Meanwhile we wish to assure you that we have available on deposit in our account with the Sterling National Bank at 1410 Broadway, New York City, sufficient funds to cover the payment required to be made upon the exercise of our option.

"Very truly yours,

[Signature of Petitioner]"

Copies of this letter were sent to the Trustees, to the railroad's Real Estate Department, and to the Clerk of this Court.

█ A striking feature of this letter is the omission of any definite statement that the petitioner was thereby exercising the option. And I cannot agree with petitioner's argument that this omission is insignificant in view of the testimony of Mr. Gasparini (head of the Debtor's Real Estate Department) that it was his understanding that the petitioner did intend the July 29 letter as an exercise of the option to purchase. It seems rather obvious that if the railroad had attempted to require the petitioner to complete the purchase, Mr. Gasparini's understanding of the letter would not be of much help, and that the petitioner would have had little difficulty avoiding liability.

The plain fact is, the petitioner did not actually exercise his option, and did not make the further payment required thereby.

█ The law on this subject is succinctly stated in Williston on Contracts, 3d ed. ¶ 62D (1968), as follows:

"When the optionee decides to exercise his option he must act unconditionally and precisely according to the terms of the option. When the acceptance is so made the optionor becomes bound. Nothing less will suffice unless the optionor waives one or more of the terms of the option. Thus, if payment by the optionee is required before the termination date of the option, exercise of the option could only be accomplished by timely payment."

course, the power of the reorganization court under § 77(o) of the Bankruptcy Act is not dependent upon the provisions of mortgage indentures.

Even if the July 29, 1970 letter could be interpreted as expressing a desire or intention to exercise the option (which, in my view, it cannot), by no stretch of the imagination could it be regarded as an unconditional act.

■ With respect to the failure to pay the $42,000, there are two possible ways of analyzing the situation. Since the option could be exercised only on or before July 31, 1970, and since the $42,000 payment was required to be made simultaneously with the exercise of the option, it is very clear that the parties contemplated that the $42,000 would be paid, if at all, on or before July 31, 1970. The money was not paid. Conceivably, the failure to make the payment could be treated as the failure to take one of the steps specifically required for the exercise of the option; or it could perhaps be regarded as an immediate default under the agreement of sale which came into being when the option was exercised. While I am inclined to believe that the former is the correct analysis, I am persuaded that, under either interpretation, the failure to make the required payment on or before July 31, 1970, would, in the absence of waiver or estoppel, bar enforcement of the agreement by the petitioner.

■■ Thus, the only substantial issue on this phase of the matter is whether compliance with the terms of the option agreement was waived by the railroad, or whether the railroad is estopped from asserting non-compliance. In this connection, it bears emphasis that, from and after June 21, 1970, the railroad was in reorganization under § 77 of the Bankruptcy Act, and its property and affairs were under the supervision of this Court. The appointment of the Trustees became finally effective on July 28, 1970. Until that date, the Debtor in possession, and after that date the Trustees, held and managed the Debtor's property as fiduciaries, for the benefit of creditors and other parties in interest. Petitioner's entire argument appears to be premised on the assumption that the intervention of bankruptcy, with its attendant uncertainties, etc., either automatically excused petitioner from complying with the terms of the option agreement, or at least would now justify the Court in finding a waiver of strict compliance where no such waiver would otherwise exist. In my judgment, exactly the opposite is true. Waiver of sustantial rights is not easily attributed to fiduciaries acting under the supervision of a court.

In the present case, there is no evidence that anyone acting for the railroad did or failed to do anything before July 31, 1970, which could possibly constitute a waiver or modification of the requirements of the option agreement. The affidavit of Mr. Goldwater (petitioner's counsel and apparently the only person handling the matter for the petitioner at the time) sets forth at great length and in considerable detail his version of the dealings during that period. In some respects, his version is obviously incorrect. For example, his affidavit asserts that he had certain discussions with the authorities of the City of New York, and conveyed the contents of those discussions to Mr. Gasparini (head of the railroad's Real Estate Department) "on or about June 1, 1970"; and that "subsequent to the June discussions, Mr. Gasparini . . . advised petitioner that steps should be taken to exercise the option to purchase without delay since the railroad was in financial difficulties and there was a chance that it would be filing a petition in bankruptcy in the near future." It is very clear that Mr. Gasparini did not have any advance knowledge of the bankruptcy petition which was filed on June 21, 1970; indeed he bought and held Penn Central stock during that period. At the hearing, Mr. Goldwater stated that he had not intended by his affidavit to allege that Mr. Gasparini had mentioned bankruptcy to him in advance of the filing of the petition.

The Goldwater affidavit is also somewhat inaccurate in its references to the record in these proceedings. For exam-

ple, referring to a July 15, 1970 conversation with Mr. Gasparini, the affidavit states:

"By this time the Court had signed Order No. 1 allowing the Debtor to remain in possession and had indicated that it was the Court's intention to grant the petition in bankruptcy and appoint trustees, but the new order of appointment had not yet been filed . . . ."

While the mischaracterizations in this language are of no particular importance in themselves, they do betray a willingness to "shoot from the hip," and make it somewhat difficult to accept the affidavit in its entirety as representing a precise, accurate, and objective portrayal of the events related.

Assuming for present purposes, however, that the affidavit is totally accurate in its accounting of all of the events which occurred on or before July 31, 1970, no waiver or modification of the terms of the option is shown. What is depicted is merely a great deal of uncertainty and confusion, numerous unanswered requests for advice from Mr. Gasparini as to how the petitioner should proceed, and a great deal of concern on the part of the petitioner as to whether, if he paid the $42,000, he would be adequately protected if the transaction thereafter could not be consummated.

The crucial part of the affidavit appears to be the following:

"On July 23 and 24 I [Mr. Goldwater] again spoke to Gasparini requesting his advice as to what to do, and he indicated once again that he would let me know. It is my recollection that Gasparini advised me he was going away for a few days after July 24. He told me, however, that I should not worry about the option letter. He indicated it would undoubtedly be held on his desk until his return to Philadelphia and he would communicate with me with respect to it as soon as he came back and would work out all problems with me.

"It was for this reason that the option letter was prepared by me in the form submitted, setting forth the reasons and problems with respect to delivery of the $42,000 cash payment required to be tendered with the option. On August 12, 1970, I spoke again to Gasparini who advised me that he was prepared to recognize the letter which had been delivered to him as a valid exercise of the option provided, however, that we would convince the Trustees that the option survived any right of the Trustees to reject or cancel the lease. . . ."

There thus appear to be two assertions: (1) that, before July 29, Mr. Gasparini told petitioner's counsel not to "worry about" the letter to be sent in exercise of the option, and that Mr. Gasparini would see the letter when he returned from vacation; and (2) that Mr. Gasparini, on August 12, 1970, stated that he would be willing to treat the July 29 letter as a valid exercise of the option, if the petitioner could persuade the Trustees that they did not have the legal right to disaffirm the transaction.

If there is one thing which is clear on this record, it is that the Trustees never agreed that they would not or could not disaffirm the proposed transaction. Indeed, one of petitioner's principal arguments is that, because the question of disaffirmance was the only issue raised by the Trustees during the intervening months and years, petitioner was led to believe that they would not challenge the validity of petitioner's attempted exercise of the option.

Thus, under any view of the matter, Mr. Gasparini's willingness to treat the July 29 letter as a valid exercise of option never became effective. But, assuming the Goldwater affidavit is intended to convey a definite and unconditional statement by Mr. Gasparini on August 12, 1970, that the letter would be regarded as a valid exercise of the option (i. e., that the railroad would waive any defense based upon the inadequacy

of the purported exercise of the option, and would instead, if it chose not to consummate the sale, rely solely upon the right of disaffirmance), it is difficult to understand how Mr. Gasparini's views ever became binding upon the Trustees, other creditors, or this Court.

It is undoubtedly true that the Trustees and their representatives never informed the petitioner, or otherwise expressed the view, that the July 29 letter was not a valid exercise of the option, until the filing of their response in the present proceeding. The record makes it quite clear that the Trustees and their staff, throughout the entire period, were relying upon their right to disaffirm executory contracts, a defense which they continue to press in this proceeding. But it can scarcely be seriously suggested that that circumstance should now be treated as equivalent to the Trustees' having sought and obtained permission from this Court to grant a new option to the petitioner to purchase the property for substantially less than its market value (or to extend an old option to the same effect).

Moreover, nothing has been shown which would prevent creditors from contending, as they do, that the option was never exercised.

I have concluded, as discussed above, that the option expired on July 31, 1970, and that the petitioner failed to exercise the option on or before that date. Thereupon, petitioner's interest as optionee terminated, and it has not been revived.

In view of these conclusions, it is unnecessary to discuss the Trustees' right of disaffirmance. It is, however, pertinent to observe that the lease undoubtedly expired on July 31, 1970, by its own terms, except for whatever rights the tenant may have had as prospective vendee under an agreement of sale emanating from the exercise of the purchase option provision of the lease. Arguments as to whether, and when a bankrupt lessor may disaffirm a lease, see e. g. Creedon & Zinman, Landlord's Bankruptcy: Laissez Les Lessees, 26 Business Lawyer 1391 (1971), are not necessarily controlling here, where the issue of affirmance or disaffirmance would relate to only one particular aspect of the agreement.

■ Section IV of the petitioner's brief argues that this Court does not have jurisdiction to determine who is entitled to participate in the fund emanating from condemnation of the property. This assertion is difficult to follow, and perhaps has now been abandoned. In addition to the express reservation of such jurisdiction in Order No. 737, there is the circumstance that it is the petitioner's own petition which seeks just such an adjudication and determination by this Court.

And now, this 20th day of March, 1975, upon consideration of the petition of John A. Dilliard for payment of a portion of the advance payment made by the City of New York for certain property condemned by the City, and for a determination of the rights of the petitioner with respect to the said advance payment and any future award (Document No. 5769), it is ordered, adjudged and decreed as follows:

1.  That the petitioner has no right to or interest in the proceeds of said condemnation award, past, present or future, and has no right, title or interest in the real estate condemned.

2.  That, to the extent the petition seeks an award to the petitioner, the petition is hereby denied.